**STATE of Tennessee**

v.

**Maron Donta BROWN.**

Supreme Court of Tennessee,
at Knoxville.

May 27, 2009 Session at Cookeville.[1]

Oct. 9, 2009.

---

1. Oral argument was heard in this case on May 27, 2009, in Cookeville, Putnam County, Tennessee, as part of this Court's S.C.A.L.E.S.

(Supreme Court Advancing Legal Education for Students) project.

M. Jeffrey Whitt and Richard L. Gaines, Knoxville, Tennessee, for the appellant, Maron Donta Brown.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Cameron L. Hyder and Rachel E. Willis, Assistant Attorneys General, for the appellee, State of Tennessee.

## OPINION

JANICE M. HOLDER, C.J., delivered the opinion of the court, in which CORNELIA A. CLARK, GARY R. WADE, WILLIAM C. KOCH, JR., and SHARON G. LEE, JJ., joined.

We granted this appeal to determine certified questions of law related to a search of a taped package found within a vehicle during a traffic stop. A majority of the Court of Criminal Appeals affirmed the trial court's denial of the defendant's motion to suppress. We conclude that: (1) the detention of the defendant did not exceed the permissible scope of the traffic stop; (2) the defendant validly consented to a search of the vehicle; (3) the scope of the defendant's consent extended to handling the package in a minimally invasive manner; and (4) the scope of consent had not been exceeded when probable cause justified opening the package. Accordingly, we affirm the judgment of the Court of Criminal Appeals.

### Facts and Procedural History

On June 18, 2001, Trooper Kevin Hoppe stopped the defendant, Maron Donta Brown, for speeding. In a subsequent search of the vehicle, Trooper Hoppe found a package containing cocaine. Mr. Brown was indicted for possession with intent to sell or deliver more than 300 grams of cocaine. He filed a motion to suppress, alleging that he was unlawfully stopped and detained, that he did not validly consent to a search of the vehicle, or, if valid consent existed, that the search exceeded the scope of his consent.

At the suppression hearing, Trooper Hoppe testified that at approximately 5:00 p.m. on June 18, 2001, he saw a Cadillac being followed closely by a Chevrolet Impala. Both vehicles were traveling 78 miles per hour in a 70-mile-per-hour zone. The Cadillac had a Texas license plate. Based on his training in drug interdiction, Trooper Hoppe believed that the Cadillac was being used as a decoy vehicle to draw attention away from the Impala. Trooper Hoppe turned on his blue lights and pursued the Impala while another trooper stopped the Cadillac.[2]

After several miles, the Impala stopped on the shoulder of the interstate. Trooper Hoppe saw Mr. Brown, who was alone in the vehicle, moving around "quite a bit." Because the vehicle was parked close to moving traffic, Trooper Hoppe approached on the passenger side. Trooper Hoppe noticed several air fresheners in the vehicle and two or three cellular telephones on the front seat. Trooper Hoppe asked Mr. Brown for his driver's license and the vehicle's registration and asked him several general questions regarding his travel plans and ownership of the vehicle. Trooper Hoppe requested that Mr. Brown step out of the vehicle and patted him down for possible weapons after seeing a "bulge" in his pocket. The pat-down revealed that Mr. Brown had a lighter and large key ring in his pocket but no weapon. Trooper Hoppe then initiated a check on Mr. Brown's driver's license and the vehicle's license plate. While waiting for the requested information, Trooper Hoppe approached Mr. Brown, who was sitting on the guardrail near the vehicle.

A video camera in Trooper Hoppe's patrol car recorded the encounter, beginning with the pursuit. The videotape was introduced as an exhibit at the suppression hearing. The videotape shows that approximately nine minutes after Mr. Brown pulled over onto the shoulder of the interstate, Trooper Hoppe approached him to request consent to search the vehicle.

2. Subsequent investigation revealed no connection between the vehicles.

The following verbal exchange took place:

Trooper Hoppe: Mr. Brown, when I was pulling you over, I noticed you was moving around the vehicle quite a bit. Why were you doing that?

Mr. Brown: I dropped my cup of water.

Trooper Hoppe: You dropped a cup of water. Okay. Nothing illegal at all in that vehicle, is there at all? No types of drugs? Have you ever been in any trouble for drugs, or anything?

Mr. Brown: [unintelligible]

Trooper Hoppe: Never been arrested for anything?

Mr. Brown: [unintelligible]

Trooper Hoppe: Oh, okay, alright. Uh, Maron, you mind me taking a quick look?

Mr. Brown: [unintelligible]

Trooper Hoppe: There's nothing in there, right?

Mr. Brown: [unintelligible]

Trooper Hoppe: Okay. What I look for is large amounts of marijuana, cocaine, methamphetamines and heroin, okay? I'm not gonna' find nothing like that in the vehicle, right? You're a straight-up guy?

Mr. Brown: Straight-up.

Trooper Hoppe: Okay, alright. I'll be right back with you. Sit right there.

At this point, Trooper Hoppe opened the front passenger door. He leaned in the vehicle and approximately ten seconds later removed a package. While Trooper Hoppe held the package a few feet from Mr. Brown and within his view, the verbal exchange continued:

Trooper Hoppe: This is a part for your car, what is this?

Mr. Brown: I don't know. It was in there when I got it. I think it's a present for my momma.

Trooper Hoppe: Hey, it's a what?

Mr. Brown: A present for my momma. A present for my momma . . . [unintelligible].

Trooper Hoppe: From who?

Mr. Brown: My sister.

Trooper Hoppe: It says "GM" on it.

Trooper Hoppe then touched one end of the package and put it close to his face. While still holding the package, he leaned back inside the vehicle. Approximately sixteen seconds later, Trooper Hoppe said something that cannot be heard clearly on the videotape except for the words "look" and "smells like." He remained in the vehicle for approximately thirty more seconds before he stepped out, drew his gun, and ordered Mr. Brown to the ground.

Trooper Hoppe testified at the suppression hearing that when he asked if he could "take a quick look in the vehicle," Mr. Brown responded, "Yeah, go ahead." Trooper Hoppe further testified that when he asked if there was "anything in the vehicle," Mr. Brown replied, "No." Trooper Hoppe also stated that when he looked in the vehicle he saw nothing to indicate that Mr. Brown had spilled a cup of water.

Regarding the package, Trooper Hoppe testified, "I grabbed the one thing that had got my attention, which was a brown cardboard box oddly taped up in the front floorboard." He described the package as "something like a large air filter for your vehicle would go in," noting that the package "was taped up with non-standard tape which said 'GM' on it." Trooper Hoppe testified that when Mr. Brown answered that the package contained a present for his mother from his sister, Trooper Hoppe "knew at that point probably it was contraband."

When asked what he did next with the package, Trooper Hoppe responded, "I leaned in the vehicle, peeled a corner up

where it was taped and smelled the odor of cocaine." He then pulled out his firearm, told Mr. Brown to get down, and handcuffed Mr. Brown. Regarding the opening of the package, Trooper Hoppe testified that he "was ripping in the package" while receiving the results of the license check. He described two items inside the package. One was "a big zip-lock [bag] with rock cocaine," which "wasn't crack cocaine but it's just the way it's chunked up cut off a kilo." The other was "a perfect kilo, what you would think a kilo would look like, and it looked like it was green material but it's got some kind of gel or axle grease or something around it I guess to mask the odor of it, or that's what it looked like."

On cross-examination, Trooper Hoppe reiterated that he thought the package "looked strange the way it was taped up." He described the tape as a "beige type tape," not like "duct tape" but "more like a parcel type tape." Trooper Hoppe answered affirmatively when asked if he "kind of got a corner open or something and smelled in there." Defense counsel then inquired, "Is that something they teach you guys at the academy or [Department of Justice] or anything, or just from personal experience?" Trooper Hoppe replied, "No. It was just, what I did I smelled of it to see what was inside of it. I felt it first and I could feel like a brick, just one big brick in it, and then there's a broke down zip-lock bag. I felt the brick in there." When the trial judge asked Trooper Hoppe if he was "feeling before [he] ever tore [the package] open," he replied, "I felt the brick in it. You could feel it."

At the end of the hearing, the trial judge indicated that he would deliver his opinion from the bench at a subsequent hearing. At the subsequent hearing, the trial court denied the motion to suppress. The trial judge stated, "I don't see anything wrong at all with the stop. The question in my mind is whether or not a knowing and informed ... consent was given in this case." When the prosecutor argued that he heard Mr. Brown say on the videotape, "Yes, sir, go ahead and look," in response to Trooper Hoppe's request to search, the trial judge remarked, "Maybe I'm deaf, but I heard 'yes' ... That's all I heard, 'yes.'"

The trial judge questioned whether Trooper Hoppe would have had probable cause to look in the package based on his opinion that the package felt like drugs. When reminded that the videotape showed Trooper Hoppe putting the package close to his face, the trial judge stated, "Well, if he smelled it that would have given him probable cause." In response to Mr. Brown's argument that opening the package exceeded the scope of consent, the State argued that Trooper Hoppe had indicated that "he picked it up and immediately felt a brick and that he smelled the package and then opened it."

Regarding the scope of consent to search, the trial judge stated, "I feel like if the consent was valid that the officer did not exceed the scope, even if he had to unwrap the package." The trial judge questioned, however, whether he would reasonably expect consent to a search of his vehicle to include consent to unwrap his Christmas presents. Ultimately, the trial judge decided that the issue of the scope of consent was not "impressive" because Trooper Hoppe had testified that when he picked up the package he "smelled it" and "it felt like a brick." Thus, the trial court implicitly found that Trooper Hoppe was no longer relying on consent to search when he opened the package because at that point, the search could be justified on another basis, namely,

the probable cause exception to the warrant requirement.

With regard to the voluntariness of the consent, the trial court was specifically concerned that Mr. Brown was not informed of his right to refuse consent to search. Notwithstanding this concern, the trial court upheld the search. The trial court found that the consent to search was unequivocal and specific, noting that Trooper Hoppe specified what he was looking for and Mr. Brown said "yes" to the search. In addition, the trial court found that the consent was uncontaminated by duress or coercion.

The trial court's written order denying the motion to suppress included no findings as to the factual circumstances surrounding the encounter. The order stated only that:

(1) Trooper Kevin Hoppe had probable cause to make a traffic stop of the defendant; (2) The subsequent detention of the defendant by Trooper Hoppe was not unreasonable; (3) The defendant's consent to search his vehicle was knowingly, voluntarily, and intelligently given; and (4) The defendant's consent to search the container within the vehicle was knowingly, voluntarily, and intelligently given.

Following the trial court's denial of the motion to suppress, Mr. Brown entered a guilty plea to the speeding charge and a conditional guilty plea to possession with the intent to deliver more than .5 grams of cocaine. He received an agreed sentence of fifteen years as a Range II, multiple offender. Under Tennessee Rule of Criminal Procedure 37(b)(2)(A), Mr. Brown properly reserved, with the consent of the State and the trial court, the following certified questions of law:

I. Whether the scope of the detention following the traffic stop for speeding was exceeded by Trooper Hoppe, without reasonable suspicion or probable cause, in violation of the Defendant's rights under Article I, section 7 of the Tennessee Constitution and the United States Constitution, Fourth Amendment.

II. Whether the Defendant consented to a search of the vehicle, and whether such consent was knowing, intelligent and voluntary under Article I, Section 7 of the Tennessee Constitution and the United States Constitution, Fourth Amendment.

III. Whether the scope of the Defendant's consent extended to the inside of the vehicle *and* of containers located therein.

IV. Whether the consent, assuming consent existed, was itself fruit of the poisonous tree because it was made during and directly resulted from the illegal detention.

The Court of Criminal Appeals held that Trooper Hoppe had not exceeded the scope of the stop when he asked Mr. Brown for consent to search the vehicle. The court also held that Mr. Brown gave valid consent to search the vehicle. On the final issue of the scope of consent, the court held that Mr. Brown's consent permitted Trooper Hoppe to pick up and feel the outside of the package but that the consent "likely did not authorize Trooper Hoppe to tear open the heavily-taped package." A majority of the court then concluded that the totality of the circumstances, including the feel of a "brick" in the package, gave Trooper Hoppe probable cause to open the package and discover the cocaine within.

We granted Mr. Brown's application for permission to appeal.

## Analysis

On appeal from the denial of a motion to suppress, we defer to the trial court's findings of fact unless the evidence in the record preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). The "credibility of the witnesses, the weight and value of the evidence, and [the] resolution of conflicts in the evidence are matters entrusted to the trial court as the trier of fact." *Id.* The prevailing party in the trial court is afforded "the strongest legitimate view of the evidence . . . as well as all reasonable and legitimate inferences that may be drawn from that evidence." *Id.*

Although videotape evidence was presented during the suppression hearing, de novo review does not apply because the trial court's findings of fact were also based on live testimony. *See State v. Northern*, 262 S.W.3d 741, 748 n. 3 (Tenn. 2008); *State v. Garcia*, 123 S.W.3d 335, 343 (Tenn.2003). Moreover, the videotape does not fully depict the encounter. *Cf. State v. Payne*, 149 S.W.3d 20, 25 (Tenn. 2004) (applying de novo review because an officer testified at the suppression hearing that the videotape fully and accurately depicted the police interview). As our recitation of the verbal exchange reflects, many of Mr. Brown's responses, as well as Trooper Hoppe's comments while inside the vehicle, cannot be heard clearly on the videotape. Furthermore, neither Trooper Hoppe's actions inside the vehicle nor the appearance of the package itself can be seen clearly on the videotape.

We may describe the evidence presented, including the words and actions of the encounter as depicted on the videotape. We may not, however, substitute our own interpretation of the events for the trial court's findings. *Garcia*, 123 S.W.3d at 349 (Holder, J., dissenting). Therefore, we review the trial court's findings of fact under the standard described in *State v. Odom. Id.* at 348–49 (citing *Odom*, 928 S.W.2d at 23). While we give deference to the trial court's findings of fact, the application of the law to those facts is a question of law, which this Court reviews de novo with no presumption of correctness. *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn.1997).

Both the federal and state constitutions protect against unreasonable searches and seizures. The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." Article I, section 7 of the Tennessee Constitution similarly guarantees "[t]hat the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures." "[U]nder both the federal constitution and our state constitution, a search without a warrant is presumptively unreasonable, and any evidence obtained pursuant to such a search is subject to suppression unless the state demonstrates that the search was conducted under one of the narrowly defined exceptions to the warrant requirement." *State v. Cox*, 171 S.W.3d 174, 179 (Tenn.2005). One of the established exceptions to the warrant requirement is consent to search.[3] *State v. Bartram*, 925 S.W.2d 227, 230 (Tenn.1996).

In the first certified question, Mr. Brown argues that his detention was unreasonable and exceeded the permissible

---

**3.** Other exceptions include search incident to arrest, plain view, hot pursuit, stop and frisk, and probable cause in the presence of exigent circumstances. *State v. Bartram*, 925 S.W.2d 227, 230 n. 2 (Tenn.1996).

scope of a lawful traffic stop. When the police have probable cause to believe that a traffic violation has occurred, the temporary detention of an individual during the stop of the vehicle is considered constitutionally reasonable, irrespective of the subjective motivations of the officer making the stop. *Whren v. United States,* 517 U.S. 806, 810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996); *State v. Vineyard,* 958 S.W.2d 730, 734 (Tenn.1997). The proper inquiry is whether, during the detention, the officer diligently pursued a means of investigation that was likely to confirm or dispel suspicion quickly. *State v. Simpson,* 968 S.W.2d 776, 783 (Tenn.1998). A reasonable traffic stop can become unreasonable " 'if the time, manner or scope of the investigation exceeds the proper parameters.' " *State v. Troxell,* 78 S.W.3d 866, 871 (Tenn. 2002) (quoting *United States v. Childs,* 256 F.3d 559, 564 (7th Cir.2001)).

Mr. Brown contends that Trooper Hoppe began his drug investigation immediately, thus exceeding the proper scope of a traffic stop. Trooper Hoppe detained Mr. Brown while checking his driver's license and the vehicle's registration and license plate. Such conduct was within the permissible scope of the traffic stop. *See Cox,* 171 S.W.3d at 180. While waiting for this information, and less than ten minutes after Mr. Brown had pulled over, Trooper Hoppe requested consent to search. Thus, at the time of the request for consent to search, Trooper Hoppe was diligently pursuing investigation of the traffic stop in a manner designed to confirm or dispel suspicion quickly. *See id.* (rejecting the contention that consent to search was obtained as a result of an unlawful detention when the process of checking the driver's license and registration lasted approximately fifteen minutes). The time, manner, and scope of Trooper Hoppe's investigation did not exceed the proper parameters of a traffic stop.

The facts of this case are different from those in *State v. Berrios,* 235 S.W.3d 99 (Tenn.2007). In that case, we held that the officer's actions in frisking the defendant and placing him in the secured area of the patrol car during a routine traffic stop while the officer checked his license and registration amounted to an unconstitutional seizure. *Id.* at 109. We contrasted those actions with ordering a driver to get out of a vehicle and stand alongside it, which can only be described as a "de minimis" intrusion or a "mere inconvenience." *Id.* at 107 (quoting *Pennsylvania v. Mimms,* 434 U.S. 106, 111, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977)). In addition, we noted that an officer may pat down an individual for weapons if he has reasonable suspicion that the driver may be armed. *Id.* at 108.

In this case, Mr. Brown alternated between standing alongside his vehicle and sitting on the nearby guardrail. Trooper Hoppe conducted a pat-down for weapons only after noticing a bulge in Mr. Brown's pocket. Trooper Hoppe's actions did not amount to an unconstitutional seizure. In answering the first certified question, we therefore agree with the trial court that the detention of Mr. Brown subsequent to the traffic stop was not unreasonable under the Fourth Amendment to the United States Constitution and Article I, section 7 of the Tennessee Constitution. Because we conclude that the detention of Mr. Brown did not exceed the permissible scope of the traffic stop, the fourth certified question regarding whether any consent given during the detention was "fruit of the poisonous tree" is pretermitted.

 In the second certified question, Mr. Brown argues that he did not knowingly, voluntarily, and intelligently consent to a search of the vehicle. "For consent to pass 'constitutional muster,' it must be 'unequivocal, specific, intelligently

given, and uncontaminated by duress or coercion.' " *Cox,* 171 S.W.3d at 184 (quoting *Simpson,* 968 S.W.2d at 784). " '[T]he existence of consent and whether it was voluntarily given are questions of fact' which require examining the totality of the circumstances." *Id.* at 184–85 (quoting *State v. Ashworth,* 3 S.W.3d 25, 29 (Tenn. Crim.App.1999)). When determining voluntariness, factors to consider include:

> (1) Time and place of the encounter; (2) Whether the encounter was in a public or secluded place; (3) The number of officers present; (4) The degree of hostility; (5) Whether weapons were displayed; (6) Whether consent was requested; and (7) Whether the consenter initiated contact with the police.

*Id.* at 185.

Mr. Brown disputes the existence of consent. He claims that his response of "yes" to the question of whether he would "mind [Trooper Hoppe] taking a quick look" meant that he did mind if Trooper Hoppe searched the vehicle. The trial court disagreed, finding that Mr. Brown consented to the search. We conclude that the evidence, consisting of the videotape and Trooper Hoppe's testimony, does not preponderate against this finding.

Nor does the evidence in the record preponderate against the trial court's finding that the consent was unequivocal, specific, intelligently given, and uncontaminated by duress or coercion. The encounter, which began at approximately 5:00 p.m., took place on the shoulder of a busy interstate. Trooper Hoppe was the only officer present. He remained polite and respectful while asking Mr. Brown general questions and specifically requesting consent to search. Trooper Hoppe did not display his weapon until after he had concluded that the package contained cocaine. Although the trial court was concerned that Trooper Hoppe did not inform Mr. Brown of his

right to refuse consent to search, this Court has declined to impose such a requirement. *Cox,* 171 S.W.3d at 184. In answering the second certified question, we therefore conclude that Mr. Brown consented to a search of the vehicle and such consent was knowing, intelligent, and voluntary under the Fourth Amendment to the United States Constitution and Article I, section 7 of the Tennessee Constitution.

 In the third certified question, Mr. Brown argues that the scope of his consent did not extend to the inside of the vehicle and to containers located therein. "[E]ven if the consent is voluntary, evidence seized in the search will not be admissible if the search exceeds the scope of the consent given." *Troxell,* 78 S.W.3d at 871. The standard for measuring the scope of consent is " 'that of "objective" reasonableness-what would the typical reasonable person have understood by the exchange between the officer and the suspect.' " *Id.* at 872 (quoting *Florida v. Jimeno,* 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991)). The expressed object of the search is relevant to the understanding of a "typical reasonable person." *See id.* at 871–72. Other relevant considerations include any express or implied limitations regarding the permissible scope of the search in terms of time, duration, area, or intensity. *Id.* at 871.

 In determining the scope of consent, we apply a common-sense interpretation to the verbal exchange between an officer and a suspect. *See Troxell,* 78 S.W.3d at 872. In *Troxell,* the officer asked the defendant during a traffic stop for speeding if he had "any weapons in the vehicle." *Id.* at 869. When the officer asked if he could "take a look," the defendant answered, "Yeah, go ahead." *Id.* After an extensive, nearly twenty-minute search of the interior of the vehicle and its contents, the officer examined the under-

carriage and gas tank. After having the gas tank removed, the officer found cocaine in it. We held that the search exceeded the scope of consent because "it was objectively reasonable to conclude that the consent to search included only the interior of the vehicle and any containers that may have contained weapons," not the undercarriage and gas tank of the vehicle. *Id.* at 872.

In this case, Trooper Hoppe specifically mentioned "drugs" when he asked Mr. Brown to confirm that there was "[n]othing illegal at all in that vehicle." Trooper Hoppe then requested permission to take a "quick look." Before beginning the search, Trooper Hoppe again asked for confirmation that there was "nothing in there." Finally, Trooper Hoppe stated that he was looking for "large amounts of marijuana, cocaine, methamphetamines and heroin" and asked Mr. Brown to confirm that there was "nothing like that in the vehicle."

. In this case, as in *Troxell*, a reasonable person would have understood the request to "look" as seeking permission to conduct a search. The expressed area of the search was "in the vehicle." The expressed object of the search was illegal drugs. "A reasonable person may be expected to know that [illegal drugs] are generally carried in some form of a container" and rarely strewn across the floor of a vehicle. *Jimeno*, 500 U.S. at 251, 111 S.Ct. 1801. Trooper Hoppe expressly limited the duration of the search by asking if he could take a "quick" look. Applying a common-sense interpretation to the entire verbal exchange, a reasonable person would have understood that the consent to search included consent to conduct a quick search of the interior of the vehicle and to handle any containers that might hold illegal drugs. The record shows that Trooper Hoppe promptly conducted the search and almost immediately found the package on the floorboard of the vehicle. At that point, the search was well within the scope of consent.

The State argues that it was reasonable for Trooper Hoppe to believe that Mr. Brown's consent extended to opening the package because Mr. Brown did not withdraw or limit his consent when Trooper Hoppe specifically asked about the package. We have previously held that the defendant's silence alone cannot expand the scope of the initial consent. *Troxell*, 78 S.W.3d at 873. Although Trooper Hoppe's search had focused on the package, he did not request permission to open it.

The United States Supreme Court has held that it is objectively reasonable for an officer to consider a suspect's consent to a search of the vehicle to include consent to open a folded paper bag on the floorboard. *Jimeno*, 500 U.S. at 251, 111 S.Ct. 1801. Distinguishing the facts from those in *State v. Wells*, 539 So.2d 464 (Fla.1989), *aff'd on other grounds*, 495 U.S. 1, 110 S.Ct. 1632, 109 L.Ed.2d 1 (1990), the Court stated, "It is very likely unreasonable to think that a suspect, by consenting to the search of his trunk, has agreed to the breaking open of a locked briefcase within the trunk, but it is otherwise with respect to a closed paper bag." *Jimeno*, 500 U.S. at 251–52, 111 S.Ct. 1801.

The State contends that a taped package is more like a closed paper bag than a locked briefcase. In distinguishing between a reasonable and unreasonable search of a container, we consider the impact of the search on two interests: "(1) the owner's expectation of privacy as demonstrated by his attempt to lock or otherwise secure the container; and (2) the owner's interest in preserving the physical integrity of the container and the functionality of its contents." *United*

*States v. Mendoza–Gonzalez,* 318 F.3d 663, 671 (5th Cir.2003) (citing *United States v. Ross,* 456 U.S. 798, 826, 102 S.Ct. 2157, 72 L.Ed.2d 572 (Powell, J., concurring); *Jimeno,* 500 U.S. at 251–52, 111 S.Ct. 1801). In analyzing these interests, the standard remains that of "objective" reasonableness.

First, we consider whether the attempts to secure the container at issue in this case demonstrated an objectively reasonable expectation of privacy.[4] The trial court made no specific factual findings regarding the container, describing it only as a "package." The Court of Criminal Appeals used the term "heavily-taped," but we find nothing in the record to support this description. The trial court accredited the testimony of Trooper Hoppe, who described the container as "a brown cardboard box oddly taped up." He described the tape as "non-standard," "beige type," and "parcel type." Although Trooper Hoppe did not describe the amount of taping on the package, he stated that he "peeled a corner up where it was taped and smelled the odor of cocaine." This testimony lends support to the trial court's finding that Trooper Hoppe would have been able to "unwrap the package."

▇ In the second part of the analysis, we consider the impact of the search on the interest of reasonably preserving the physical integrity of the package and the functionality of its contents. A reasonable search, initially conducted within the scope of consent, can become unreasonable if the container or its contents are destroyed or intentionally damaged. *See State v.*

*McCrary,* 45 S.W.3d 36, 44 (Tenn.Crim. App.2000) (agreeing with the trial court that consent to search the vehicle likely did not authorize an officer to cut open locked duffel bags with a knife). Although we are hampered in our analysis by the lack of any specific findings by the trial court regarding the manner in which the package was opened, the trial court implicitly accredited Trooper Hoppe's testimony in denying the motion to suppress. Trooper Hoppe testified that he peeled a corner up where the package was taped and smelled the odor of cocaine. Peeling up tape on the corner of a package could hardly be categorized as a destructive opening.

▇ We agree with the trial court's implicit holding that it was objectively reasonable for Trooper Hoppe to conclude that the scope of Mr. Brown's consent extended to handling the package in a minimally invasive manner, such as peeling up the tape. We also agree with the trial court's implicit holding that Trooper Hoppe had probable cause to open the package after he had peeled up the tape and detected the odor of cocaine.[5] We therefore do not reach the issue of whether tearing open the package, which occurred after Trooper Hoppe had probable cause to search it, exceeded the scope of consent. In answering the third certified question, we conclude that the scope of Mr. Brown's consent extended to the inside of the vehicle and to handling the containers therein in a minimally invasive manner and that the scope of consent had

---

**4.** We must assume for purposes of this appeal that Mr. Brown had standing to assert an expectation of privacy in the package, despite his disavowal of ownership, because the State did not raise the standing issue.

**5.** No warrant was required because of the "automobile exception" to the warrant requirement. *See California v. Acevedo,* 500 U.S. 565, 576, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991); *see also State v. Leveye,* 796 S.W.2d 948, 953 (Tenn.1990) (acknowledging that this Court has consistently followed United States Supreme Court decisions involving the automobile exception and deeming it "appropriate to continue to do so").

not been exceeded when probable cause justified opening the package.

### Conclusion

We hold that: (1) the detention of Mr. Brown did not exceed the permissible scope of the traffic stop; (2) Mr. Brown validly consented to a search of the vehicle; (3) the scope of Mr. Brown's consent extended to handling the package in a minimally invasive manner; and (4) the scope of consent had not been exceeded when probable cause justified opening the package. The judgment of the Court of Criminal Appeals is therefore affirmed. It appearing that Mr. Brown is indigent, costs of this appeal are assessed to the State of Tennessee, for which execution may issue if necessary.